## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2018, 10:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

K.S.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

October 31, 2018

Court of Appeals Case No.
18A-JV-1304

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause No.
40C01-1801-JD-1

**Robb, Judge.**

# Case Summary and Issue

[1] When K.S. was adjudicated a delinquent child in February 2018, the juvenile court awarded wardship of him to the Indiana Department of Correction ("DOC") but suspended the commitment and placed K.S. on probation. The State subsequently filed a petition to modify the dispositional decree, and upon finding that K.S. had committed batteries on family members while on probation, the juvenile court committed K.S. to the DOC. K.S. now appeals, raising two issues for our review that we consolidate and restate as one: whether the juvenile court abused its discretion in modifying K.S.'s placement when it did not make a specific finding as to K.S.'s status and did not consider less restrictive placements. Concluding the trial court did not abuse its discretion, we affirm.

# Facts and Procedural History

[2] K.S. and his siblings were adopted by their grandmother, Teresa, after they were abandoned by their parents and an adoptive placement with their aunt and uncle was terminated. Teresa often called the police when K.S. was disobeying her or acting out; an incident report from the North Vernon Police Department about a December 3, 2017 dispatch to the house stated:

> Officers have been dispatched to this address a total of 19 times between August 2016 and December of this year. The nature of the calls are threats, juvenile problems, Domestic Disturbance and Disturbance. Most if not all of these calls were due to [K.S.'s] actions.

Appellant's Appendix, Volume 2 at 36.

[3] Although never fully diagnosed, it appears K.S. suffers from several mental health disorders, and he has been prescribed various medications. In late 2017, K.S. was admitted to Bloomington Meadows Hospital for three days after expressing suicidal thoughts. He also sees a psychologist weekly and works with two therapists on life skills through Centerstone, a provider of behavioral health services. At some point, the Indiana Department of Child Services ("DCS") became involved with the family to investigate neglect of the children.

[4] On January 30, 2018, the State filed a petition alleging K.S. was a delinquent child due to committing acts that, if committed by an adult, would constitute theft, a Class A misdemeanor, for stealing earbuds from his school; battery, a Class B misdemeanor, for hitting his brother; and battery, a Class B misdemeanor, for hitting his sister. It was noted in the preliminary inquiry report that there was an "[a]ctive neglect investigation by DCS." *Id.* at 11. However, the probation officer affirmed that he had completed a factual review of the child's status and history pursuant to Indiana Code section 31-37-8-1 and reported that K.S. "has NOT been identified as a dual status child." *Id.* at 13. K.S. admitted to the allegations and on February 15, 2018, the juvenile court issued a dispositional decree in which it awarded wardship of K.S. to the DOC but suspended his commitment and placed K.S. on probation for one year. During his probation, K.S. was to attend school every day; obey all laws; consent to reasonable searches of his home, vehicle, or person; participate in and successfully complete counseling; and pay fees and costs.

[5] By April of 2018, K.S. was detained at the Bartholomew County Juvenile Detention Center "to protect himself, his family and the community from further acts of juvenile delinquency." *Id*. at 67. Police had been called to Teresa's residence at least four times after the February disposition. Specifically, Teresa called the police on one occasion when K.S. left the house without permission and on three other occasions when K.S. hit one or more members of the family. Following the fourth call, K.S. was detained.

[6] On April 24, 2018, the State filed a petition to modify the dispositional decree, alleging K.S. had failed to obey all laws and requesting that the disposition be modified to commitment to the Indiana Boys School. The modification report from the juvenile division recommended that K.S. be sent to the Boys School because "[h]e is unlikely to change his behavior." *Id.* at 72. On April 30, 2018, K.S. admitted he committed the alleged batteries and the trial court held a dispositional hearing. Teresa testified that she had tried to find K.S. a residential placement through Centerstone but was unable to do so because of his inappropriate behaviors. Although Teresa believed K.S. is capable of obeying the rules, he just "chooses not to." Transcript of the Evidence, Volume 2 at 15.

[7] Andrew Judd, K.S.'s probation officer, testified that he had worked with DCS and Centerstone to try to find a placement for K.S. at "every facility we could think of in the State" but he was denied "[p]rimarily because of his aggressive behavior[.]" *Id.* at 22-23. Judd recommended that K.S. be placed at the Boys School because "they have twelve different facilities throughout the State that

they use, they do a two-week psychiatric evaluation before he's made a placement." *Id.* at 23. "[T]he other good thing about Indiana Boy [sic] School . . . is that the only way to get out . . . is to earn your way out, you have to work the program, . . . and in [K.S.'s] case, he needs to learn that he needs to change his behavior for real and for good[.]" *Id.* Judd noted that K.S. was a "model prisoner" when he was detained in the past and was doing well in detention currently. *Id.* at 24.

[8] K.S. also testified to his thoughts regarding the modification of his dispositional order. He felt being placed at the Boys School would be "okay" because of the issues in his past and how well he was doing in detention currently. *Id.* at 28. He noted he "would love to go back home, but . . . it's not really gonna be a good decision to go back home right now, cause I'm not ready." *Id.*

[9] The juvenile court modified K.S.'s disposition and ordered him committed to the Indiana Boys School:

> I've been doing this almost twenty-two years, and in that period of time I can probably still count on my hands and my feet the number of kids that I've sent to the detention center . . ., because I realize that it's kind of the end of the road as far as what I can do to try to help people. But, this is a case where there's nothing else for me to do. . . . [I]f [the Boys School] can't help you get this done you'll at least figure out that there are consequences for bad behavior.

*Id.* at 29-30. K.S. now appeals.

# Discussion and Decision

## Modification of Delinquency Disposition

[10] K.S. claims the juvenile court abused its discretion in committing him to DOC for placement at the Indiana Boys School because it did not properly assess whether he was a dual status child as required by statute and did not impose the least restrictive dispositional alternative.

### A. Dual Status

[11] "Research has demonstrated that there is a greater likelihood of delinquency among children who have suffered abuse and neglect." Dual Status Resource Notebook, Tab 3: Why Dual Status?, https://www.in.gov/judiciary/probation/files/Dual%20Status%20Resource%20Notebook.pdf (last visited October 18, 2018). Indiana Code Article 31-41 was enacted in 2015 to address the specific needs of these children by providing both the child welfare system and the juvenile justice system "tools to identify, communicate and implement a coordinated plan that serves a child's best interests and welfare." *Id.* Therefore, when a child enters either the child welfare system or the juvenile justice system, the court and responding agencies must determine whether a child is a dual status child and proceed accordingly. *See* Ind. Code § 31-34-7-1 (requiring dual status determination in preliminary inquiry of a child in need of services ("CHINS") allegation); Ind. Code § 31-37-8-1 (requiring same in preliminary inquiry of a delinquency allegation).

[12] As potentially relevant to this case, a "dual status child" is defined as one who, among other things:

- is alleged to be or is presently adjudicated to be a CHINS and is alleged to be or is presently adjudicated to be a delinquent child, Ind. Code § 31-41-1-2(1);

- is presently named in an informal adjustment under the CHINS statute and who is adjudicated a delinquent child, Ind. Code § 31-41-1-2(2); or

- who has been previously adjudicated a CHINS or was a participant in an informal adjustment under the CHINS statute and was under a wardship that has been terminated or a program of informal adjustment that has been terminated before the current delinquency petition, Ind. Code § 31-41-1-2(4).

[13] There are at least three times in the juvenile delinquency process when a dual status screening tool is to be completed: when an intake officer makes the preliminary inquiry, Ind. Code §§ 31-37-8-1, -2; when a juvenile court finds a child is a delinquent child, Ind. Code § 31-37-13-2; and when a probation officer prepares a predispositional report, Ind. Code § 31-37-17-6.1. The "dual status screening tool" is "a factual review of a child's status and history" used to determine whether the child meets the definition of a dual status child such that the child should be referred for an assessment by a dual status assessment team.[1]

---

[1] The "dual status assessment team" is a committee assembled by a juvenile court to recommend the proper legal course for a dual status child. Ind. Code § 31-41-1-5.

Ind. Code §§ 31-41-1-3, 31-37-8-5. Finally, the juvenile court's dispositional decree is to be accompanied by written findings and conclusions including a specific finding as to whether the child is a dual status child. Ind. Code § 31-37-18-9(a)(6).

[14] K.S. contends he was denied due process when the juvenile court failed to make a specific finding as to whether he was a dual status child. We begin by noting the State argues K.S.'s claim was waived for failure to raise it to the juvenile court. When modification of a dispositional decree is requested, the probation department must complete a modification report governed by the requirements for a predispositional report, Ind. Code § 31-37-22-4 (incorporating the requirements of Ind. Code ch. 31-37-17 regarding predispositional reports), and the juvenile court must comply with the requirements governing dispositional orders, including the requirement for written findings and conclusions, Ind. Code § 31-37-22-3(c) (incorporating the requirements of Indiana Code section 31-37-18-9). As a dual status screening tool is therefore to be completed in a modification report, as the juvenile court is to include a finding as to whether the child is a dual status child in its modified dispositional order, and as a child's status in the child welfare system can change during delinquency proceedings, it is unclear when the State thinks K.S. should have objected to the juvenile court's failure to do so before now. K.S. could not have known the juvenile court would not make the required finding until the modified dispositional order was entered. Moreover, K.S. primarily uses the possibility

of his dual status as a reason why the trial court's modification disposition was an abuse of discretion.

[15] "The standard for determining what due process requires in a particular juvenile proceeding is 'fundamental fairness.'" *D.A. v. State*, 967 N.E.2d 59, 64 (Ind. Ct. App. 2012). A juvenile charged with delinquency is entitled to the "common law jurisprudential principles which experience and reason have shown are necessary to give the accused the essence of a fair trial." *K.A. v. State*, 938 N.E.2d 1272, 1274 (Ind. Ct. App. 2010), *trans. denied*. These principles include the right to have a competency determination, the right to notice of the charges, the right to counsel, the privilege against self-incrimination, and the right to confront witnesses, and, in the case of a modification, the right to an evidentiary hearing. *Id.* at 1274-75.

[16] K.S. is correct that the legislature has provided a fairly detailed list of procedural requirements for juvenile courts to follow in delinquency proceedings and he is also correct that the juvenile court's modification order does not comply with the relevant statute as it does not make a specific finding as to K.S.'s status. Although the modification order fails to include a specific finding as to K.S.'s dual status, the record shows that the intake officer completing the preliminary inquiry in January 2018 had information regarding K.S.'s birth parents, the failed adoption by his aunt and uncle, and the current DCS involvement with the family, but reported that K.S. was *not* identified as a dual status child. Appellant's App., Vol. 2 at 13. K.S.'s probation officer was clearly aware of K.S.'s situation, yet he still recommended the juvenile court

proceed with delinquency proceedings and then, just three months later, recommended that K.S.'s placement be changed to the Indiana Boys School. The brief and cryptic references in the paper record may suggest the possibility that K.S. could be a dual status child, but there is no clear indication of K.S.'s status within the child welfare system and certainly no indication that his status changed between the preliminary inquiry and the modification hearing. These procedural deficiencies, however, do not rise to the level of a constitutional violation because K.S. was given notice of the charges against him alleged to warrant modification of his placement, had counsel, and was afforded an evidentiary hearing at which no evidence was adduced that would clearly support a finding that he was a dual status child. K.S.'s background is nevertheless a factor to be considered in the appropriate disposition.

## B. Placement on Modification

[17]    K.S. also challenges the juvenile court's order modifying the dispositional decree, alleging there were other "intermediate" dispositional alternatives available besides commitment to the DOC. Corrected Brief of Appellant at 28.

[18]    The juvenile court is accorded "wide latitude and great flexibility in dealing with juveniles[.]" *C.T.S. v. State*, 781 N.E.2d 1193, 1203 (Ind. Ct. App. 2003), *trans. denied*. The specific disposition of a delinquent child is within the juvenile court's discretion, to be guided by the following considerations: the safety of the community, the child's best interests and freedom, the least restrictive alternative, family autonomy and life, and the freedom and opportunity for participation of the parent, guardian, or custodian. *K.S. v. State*, 849 N.E.2d

538, 544 (Ind. 2006); *see also* Ind. Code § 31-37-18-6. We reverse only for an abuse of discretion, that is, a decision that is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *K.S.*, 849 N.E.2d at 544.

K.S. was offered the opportunity to conform his behavior to an acceptable standard while on probation and was unable to do so for even the shortest period of time. Despite the services being offered to him, including in home mental health and life skills therapy, he continued to act out inappropriately. Even K.S. acknowledged that he was doing better in a more structured environment and that he would likely not be successful if he were to go home at this point. Although K.S. posits he could have been continued on probation and placed in a home without other children, the modification report indicated he was not a candidate for foster placement "because of his previous violent behavior." Appellant's App., Vol. 2 at 72. Also, this was not an original proceeding – K.S. was already under a suspended commitment to the DOC. He clearly knew the consequences of failing to live up to the terms of his probation. With evidence that K.S. had multiple chances to change his behavior but instead repeatedly violated his probation in a short period of time, the juvenile court reasonably concluded that commitment to the DOC, where his mental health issues could be evaluated and his particular needs addressed at an appropriate facility, served everyone's best interests.

# Conclusion

[20] The juvenile court did not abuse its discretion in modifying K.S.'s placement and ordering his commitment to the DOC. The juvenile court's modification order is therefore affirmed.

[21] Affirmed.

Baker, J., and May, J., concur.