## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 10 2019, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

D.C.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

December 10, 2019

Court of Appeals Case No.
19A-JV-541

Appeal from the Greene Circuit Court

The Honorable Erik Allen, Judge

Trial Court Cause No.
28C01-1804-JD-29

**Bailey, Judge.**

# Case Summary

D.C. was adjudicated a delinquent child. The trial court entered a dispositional decree that it later modified, placing D.C. in a residential facility. D.C. now challenges the order modifying the dispositional decree, contending that (1) he was deprived of due process through a failure to adhere to statutory procedures and (2) the trial court abused its discretion by ordering residential placement.

We affirm.

# Facts and Procedural History

In April 2018, the State filed a petition alleging fourteen-year-old D.C. was a delinquent child for committing acts that would constitute Disorderly Conduct, as a Class B misdemeanor, if committed by an adult.[1] A preliminary inquiry report was completed, which indicated that D.C. was designated as learning disabled and had an individualized education program. The trial court held an initial hearing, at which it set the matter for a fact-finding hearing and ordered D.C. to "attend school regularly with no unexcused absences or disciplinary problems and follow all the rules of his household." App. Vol. II at 56.

In May 2018—before the scheduled fact-finding hearing—D.C.'s probation officer moved for a hearing, alleging D.C. had violated the court's order by

---

[1] *See* Ind. Code § 35-45-1-3(a).

refusing to participate in class and refusing to go to school. The trial court held a hearing at which D.C. admitted to refusing to go to school and refusing to go to class when he was at school. The court asked D.C. why he was not willing to go to school. D.C. responded, "Every time I go to school I get called to the principal's office for something stupid." Supp. Tr. at 18. D.C. explained that he had been called to the office for hygiene-related issues. The trial court asked whether D.C. had the option to shower at home. D.C. confirmed that he did. The court asked D.C. whether his refusal to go to school was related to being called into the principal's office or was related to "something else." *Id.* at 20. D.C. replied that it was "mainly that." *Id.* The court then asked, "What else?" *Id.* at 21 D.C. replied, "It's really nothing else." *Id.* In a written order following the hearing, the trial court concluded D.C. had violated its order. The court confirmed the date of the fact-finding hearing and ordered D.C. to "remain in the home" with the same requirements concerning attending school. App. Vol. II at 67. The court advised D.C. that "if one report is received that [D.C.] has refused to attend school he shall immediately be placed in secured detention without further hearing until further order of this Court." *Id.*

[5] D.C. later entered an agreement with the State whereby D.C. would admit to having engaged in the alleged delinquent conduct in exchange for agreed recommendations concerning the disposition. In June 2018, the trial court held an admission hearing at which D.C. admitted he had engaged in the alleged delinquent conduct. D.C. specifically admitted that he (1) refused to get out of the vehicle when his mother drove him to school, (2) eventually got out of the

vehicle and walked away, and then (3) yelled when school resource officers tried to get him to go to school. The trial court adjudicated D.C. a delinquent child and entered a dispositional decree, accepting the recommendations set forth in the agreement. In accordance with those recommendations, the trial court ordered D.C. to "participate in an inpatient or outpatient diagnostic evaluation, whichever one can occur first," and follow all recommendations. *Id.* at 73. The court also ordered D.C. to "attend school regularly." *Id.* The trial court further ordered D.C. to "have no . . . disciplinary problems" and to "complete his assignments and do all the work to the best of his ability." *Id.*

[6] In September 2018, D.C.'s probation officer petitioned to modify the dispositional decree, alleging D.C. was failing five classes and had excessive absences, including one truancy. In the petition, the probation officer suggested that D.C. "should be sent for a diagnostic evaluation" and that "[p]art of the issue is [D.C.'s behavior], the other [part] is the parental response to it." *Id.* at 76. The probation officer stated that she would be "looking into a foster home placement as a potential recommendation, if it is recommended by the diagnostic evaluation," and that D.C. was "currently participating in his out-patient diagnostic [evaluation] but, it has not been finished to date." *Id.*

[7] On September 18, 2018, the trial court held a hearing on the petition to modify at which D.C. admitted to the allegations. In its written order, the court ordered D.C. to obtain a diagnostic evaluation from the Logansport Juvenile Correctional Facility, which was scheduled to begin on October 3, 2018. For the purpose of obtaining this evaluation, the court granted temporary wardship

to the Logansport facility and specified that, upon completion of the evaluation, D.C. would be returned to the custody of his mother. Pending commitment for the evaluation, the court ordered D.C. to "attend school with no unexcused absences or discipline complaints" and "complete his school work and obtain passing grades." *Id.* at 83. The court advised D.C. that "if he refuses to go to school in the future, he may immediately be placed in Secure Detention." *Id.*

[8] On September 20, 2018, D.C.'s probation officer filed a petition to modify the dispositional decree, alleging D.C. "was truant from school the day after his Court proceeding, September 19th, 2018, and was marked unexcused as of 12:19 p.m., no call in on September 20th, 2018." *Id.* at 90. The probation officer asked that D.C. "be taken into custody and placed in secure detention . . . and then be sent to [the Indiana Boys' School]." *Id.* The court issued an order authorizing taking D.C. into custody and transporting him to a secure detention center. D.C. was taken into custody and brought to the center.

[9] On September 24, 2018, the trial court held a hearing at which D.C. admitted to having failed to go to school. D.C. also admitted that, while in the detention center, he failed a test concerning the rules of the center, and that—each day after that—he refused to again take the test when asked. At one point, the trial court asked D.C.'s mother if she had anything to add, and she mentioned that she thinks D.C. was having trouble reading the test. D.C. interjected, "No, I'm not." Tr. at 40. The trial court questioned D.C. about the root of his problems. The court also asked the probation officer whether the court-ordered diagnostic evaluation scheduled for October 3 through October 24 was the earliest it could

be scheduled. The probation officer confirmed those dates were "the quickest we could get." Tr. at 43. The court then asked whether there was "emergency shelter care or anything of that nature that would be available, appropriate to give him the opportunity to get to the point of the diagnostic short of commitment." *Id.* The court recessed, allowing time to explore options.

[10] When the hearing resumed, the trial court said, "I don't think returning home right now is an option." *Id.* at 46. The court mentioned that its "thought is to try to get in the least restrictive option that we have, get him to the diagnostic to try to get additional information to figure out what direction to go from here." *Id.* at 45. The trial court told D.C. that it was considering three placement options—emergency shelter care, secure detention, or commitment to the Indiana Boys' School. The court asked D.C. if he had any input on those options, and D.C. did not respond. The court again asked D.C. if there was anything he wanted to tell the court about those options, and D.C. said, "No." *Id.* at 46. The court ordered that D.C. be placed in emergency shelter care until the diagnostic evaluation, explaining to D.C. that if he did not follow the rules of emergency shelter care, he would "immediately go back to secure detention." *Id.* at 46. The court then scheduled a detention hearing for October 25, 2018.

[11] The evaluation was conducted, and D.C. was returned to emergency shelter care on October 24, 2018. At the detention hearing the next day, D.C.'s probation officer suggested that D.C. be released to his mother's care pending the results of the evaluation. The State and D.C. agreed with the plan. At that point, the court asked D.C. what was going through his mind, keeping him

from wanting to go to school. D.C. replied that he "just didn't really like the [computers used at school] and part of it is I just didn't really like school." Tr. at 57. The trial court adopted the recommendations, releasing D.C. to his mother's care "under previous orders, specifically that he attend school daily with no refusals." App. Vol. II at 105. The trial court stated that it would schedule a hearing when the results of the diagnostic evaluation were available.

[12] The diagnostic evaluation—submitted to the court on November 9, 2019, stated that D.C. met the criteria for a history of childhood neglect. The evaluation also stated that D.C. exhibited seven of eight symptoms of Oppositional Defiant Disorder, and that his symptoms were severe in nature. The evaluation indicated that D.C. was "at risk of developing Conduct Disorder and Antisocial Personality Disorder, if his behavioral trajectory does not change." *Id.* at 176. The evaluation stated that treatment for Oppositional Defiant Disorder usually consists of a combination of therapy, problem-solving skills training, school-based programs, and psychiatry. The recommendation was for treatment and "participation in structured activities in the community and/or school which will give him the opportunity to meet quality individuals who will be a positive influence." *Id.* at 180. The evaluation further provided that D.C. "will, most likely, require strict Court supervision in order to be successful with community based services. If he fails to cooperate with the stipulations of his probation, placement in a structured residential treatment setting is recommended." *Id.*

[13] The next hearing was held on December 11, 2018. The hearing did not focus on the evaluation results, but instead on progress D.C. had made. The

probation officer explained that D.C. had not had attendance problems since the last hearing and was doing better in school, with teachers commenting that D.C. was participating in class. When the court asked D.C. to identify the cause of the change, D.C. responded that he "didn't like the facilities" and did not want to go back. Tr. at 62. The probation officer recommended that the dispositional decree be modified so that D.C. was ordered to participate in at least one extracurricular activity and that the family be ordered to participate in a sixth-month program. D.C. and his mother agreed with the plan, and the court entered a modified order reflecting the additional requirements.

[14] On January 25, 2019, the probation officer filed a petition to modify, alleging D.C. had excessive absences and failing grades as a direct result of not attending school. The trial court held a hearing on January 29, 2019, at which D.C. admitted to having excessive absences. He stated that he was sick on several school days but, for the last few days, "just didn't feel like going." *Id.* at 69. The trial court set the matter for a dispositional hearing the following week.

[15] At the February hearing, the probation officer discussed the services D.C. had been provided since the case began. She testified that, after the previous hearing, D.C. missed more school and "we're back to where we were last year when we came into court and he was told to go to school and then he didn't go to school the next day. So, at this point, I don't know what else to do." *Id.* at 76. The probation officer testified that if D.C. was in a residential facility, "they will ensure that he goes to school for the remainder of the semester, he'll get the help that he needs, he will also get the therapy that he needs to figure out why

he can't get to school every day." *Id.* D.C. also testified at the hearing. When asked what assurance he could give that he was going to follow through on what he was asked to do, D.C. answered, "Uh, none really." *Id.* at 79. The court asked D.C. if anything was going on at home. D.C. responded, "No, it's just when I get there it's just I'm so tired like at the end of the day." *Id.* at 80.

[16] Following the hearing on the petition to modify, the trial court entered a modified order placing D.C. in a residential facility. The court also scheduled a review hearing for April 30, 2019. In its oral remarks at the prior hearing, the trial court explained that it needed to "intervene and provide some needed services and we tried to do that in the home and that has not proven to be effective unfortunately and the next step is residential placement." *Id.* at 88. The trial court stated that "returning home would be contrary to the welfare and best interest. [D.C.] is not getting educational and other services that are meeting his needs at this point. He needs more in depth, intensive services than what can be provided in the home to meet his needs." *Id.*

[17] D.C. now appeals.

# Discussion and Decision

## Due Process

[18] D.C. claims a violation of his constitutional right to due process. *See* U.S. Const. amend XIV; Ind. Const. art. 1, § 12. "The standard for determining what due process requires in a particular juvenile proceeding is 'fundamental

fairness.'" *K.S. v. State*, 114 N.E.3d 849, 853 (Ind. Ct. App. 2018) (quoting *D.A. v. State*, 967 N.E.2d 59, 64 (Ind. Ct. App. 2012)), *trans. denied*. Further, whether due process was denied is a question of law that we review *de novo*. *A.M. v. State*, No. 19S-JV-603, 2019 WL 5883520, at *3 (Ind. Nov. 12, 2019).

[19] Before a court enters a dispositional decree, it must order a predispositional report in accordance with the following statute:

> Upon finding that a child is a delinquent child, the juvenile court shall order a probation officer to prepare a predispositional report that contains:
>
> > (1) a statement of the needs of the child for care, treatment, rehabilitation, or placement;
> >
> > (2) a recommendation for the care, treatment, rehabilitation, or placement of the child;
> >
> > (3) if the recommendation includes an out-of-home placement other than a secure detention facility, information that the department requires to determine whether the child is eligible for assistance under Title IV-E of the federal Social Security Act (42 U.S.C. 670 et seq.);
> >
> > (4) a statement of the department's concurrence with or its alternative proposal to the probation officer's predispositional report, as provided in section 1.4 of this chapter; and
> >
> > (5) a statement of whether the child receives Medicaid.

I.C. § 31-37-17-1(a). Moreover, Indiana law requires another report—with the same contents as a predispositional report—before modifying a dispositional decree. *See* I.C. 31-37-22-4. Indiana Code Section 31-37-17-6.1 lists additional information a probation officer "must include" in these reports, including the results of a dual-status screening tool that bears on whether the child is both a delinquent child and a child in need of services. I.C. 31-37-17-6.1(a). The list also includes "[a] description of all dispositional options considered" and "[a]n evaluation of each of the options considered in relation to the plan of care, treatment, rehabilitation, or placement recommended" under statutory guidelines. *Id.* Further, if a delinquent child is known to be eligible for special education services, a representative from his school is obligated to attend any conference initiated by the preparer of the report. I.C. §§ 31-37-17-1.1 & -1.2.

[20] In arguing he was deprived of due process, D.C. focuses on a lack of reporting. He asserts—and the State does not dispute—there was (1) no predispositional report before the June 2018 dispositional decree and (2) no such reports before subsequent modifications, including the most recent modification. D.C. argues that compliance with the statutes "would have informed the court and protected D.C.," providing information about "his best interests, need for services, and level of needs, strengths, and risks." Br. of Appellant at 16. D.C. observes that there was an opportunity for input from his school, and he expresses particular concern about whether he is a dual-status child. Ultimately, at bottom, D.C. appears to argue that procedural irregularities resulted in a dearth of information before the court, rendering the proceedings fundamentally unfair.

[21]     We do not condone a lack of statutory compliance. However, procedural irregularities do not render proceedings *per se* fundamentally unfair. *See, e.g.,* *K.S.*, 114 N.E.3d at 853-54. As to the original decree, D.C. did not timely appeal that order. Regardless, D.C. negotiated an agreement whereby he would admit to the allegations in exchange for specific recommendations for the dispositional decree. Although it appears the court did not consult a predispositional report before adopting those recommendations, we cannot say it was fundamentally unfair to adopt D.C.'s agreed-upon recommendations.

[22]     D.C. also suggests that statutorily prescribed dual-status screens might have changed the course of the proceedings. However, when the court asked D.C. whether there was anything going on at home, D.C. said there was not and that he had been tired. In the past, D.C. attributed his attendance issues to a lack of desire to attend school. Further, there was testimony that D.C.'s brother—who resided with D.C.—was not having issues with school attendance. D.C. points out that there had been a prior informal adjustment by the Indiana Department of Child Services. However, we are not persuaded the proceedings were fundamentally unfair due to a failure to conduct dual-status screens. *See, e.g.,* *id.* at 854 (determining that certain procedural irregularities concerning a dual-status determination did not amount to a violation of the right to due process).

[23]     Ultimately, it would have been preferable for the trial court to adhere to the procedures set forth in the Indiana Code and obtain the reports specified therein. We urge courts to do so. As to the fairness of the instant proceedings, however, the record indicates that the trial court thoughtfully responded to the

developing circumstances and proactively sought information. Indeed, the trial court regularly consulted with probation, asked questions of D.C. and his mother, and sought a detailed diagnostic evaluation. Moreover, D.C. was represented by counsel. He was afforded notice and an opportunity to be heard before the initial dispositional decree and each modification. At times, the court directly asked D.C. for input about his placement. We are ultimately not persuaded that the instant proceedings were fundamentally unfair to D.C.[2]

## Placement Location

[24] A court is afforded "wide latitude and great flexibility in its dealings with juveniles." *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). We review its placement decisions for an abuse of discretion, which occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *K.S.*, 114 N.E.3d at 854.

[25] Indiana Code Section 31-37-18-6 provides as follows:

---

[2] D.C. mentions that "[h]e was originally placed on probation for one year for what would be a class B misdemeanor if committed by an adult. The maximum sentence for an adult for a Class B misdemeanor is six months." Br. of Appellant at 12. However, our criminal sentencing scheme is irrelevant, as "[j]uvenile delinquency proceedings are civil proceedings, not criminal proceedings, and are based on a philosophy of social welfare rather than criminal punishment." *D.M. v. State*, 949 N.E.2d 327, 333 n.6 (Ind. 2011). Indeed, unlike the criminal court system, "[t]he juvenile court system is founded on the notion of *parens patriae*, which allows the court the power to step into the shoes of the parents." *In re K.G.*, 808 N.E.2d 631, 635 (Ind. 2004).

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> > (1) is:
> >
> > > (A) in the least restrictive (most family like) and most appropriate setting available; and
> > >
> > > (B) close to the parents' home, consistent with the best interest and special needs of the child;
> >
> > (2) least interferes with family autonomy;
> >
> > (3) is least disruptive of family life;
> >
> > (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
> >
> > (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[26] D.C. argues that placing him in a residential facility was an abuse of discretion. He asserts that "there is no evidence that relative or other family like settings were considered for D.C. nor were the identified in home services implemented as they should have been prior to taking the step to remove D.C. for months." Br. of Appellant at 19. D.C. minimizes the circumstances that led to removal, pointing out that "[a]lthough D.C. had a disorderly conduct adjudication, he is in the delinquency system because he was not going to school." *Id.* at 18.

This case arose because D.C. defiantly and disruptively refused to attend school—despite the initial intervention of a school resource officer. The original decree required D.C. to regularly attend school. Yet, D.C. continued to refuse. After D.C. was committed for a diagnostic evaluation and returned to his mother's care, D.C. made progress. However, it was not long until D.C. returned to his pattern of defying court orders and falling behind in class. The diagnostic evaluation stated that D.C. would most likely need "strict Court supervision in order to be successful with community based services." App. Vol. II at 180. The evaluation specified that if D.C. "fail[ed] to cooperate with the stipulations of his probation, placement in a structured residential treatment setting is recommended." *Id.* Ultimately, D.C. again failed to follow court orders. Thus, the community-based services were not a success, and the result of the diagnostic evaluation was a recommendation for residential placement.

D.C.'s probation officer also recommended placement in a residential facility, observing that D.C. "needs some assistance that we can't provide" and that she "can't make him go to school nor at this time can his mother." *Id.* at 75. The probation officer opined that D.C. "needs to be in some kind of residential setting where he will not only get therapy to deal with his issues and assist him in these matters, he will go to school every day and he'll get in the pattern of dealing with going to school every day." *Id.*

In arguing that the trial court erred in ordering residential placement, D.C. observes that he was not far into the six-month program. Yet, there was evidence of "minimal cooperation with the program." Tr. at 76. Regardless,

D.C. continued to miss school while community-based services were in place. Ultimately, in light of progress D.C. made after being in a structured residential environment during the weeks-long diagnostic evaluation, and the lack of sustained progress when placed with his mother, we cannot say that placement in a residential facility was clearly against the logic and effect of the facts and circumstances before the trial court. The court did not abuse its discretion.

## Conclusion

[30] The procedures leading to a modified decree were not fundamentally unfair. The court did not abuse its discretion in placing D.C. in a residential facility.

[31] Affirmed.

Kirsch, J., and Mathias, J., concur.