## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 02 2020, 10:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office
Cass County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

**T.C.,**
*Appellant-Respondent,*

v.

**State of Indiana,**
*Appellee-Petitioner.*

July 2, 2020

Court of Appeals Case No.
20A-JV-295

Appeal from the Cass Circuit Court

The Honorable Stephen Roger Kitts II, Judge

Trial Court Cause Nos.
09C01-1906-JD-34
09C01-1909-JD-72
09C01-1911-JD-84

**Bailey, Judge.**

# Case Summary

[1] T.C. appeals the juvenile court order awarding wardship of him to the Indiana Department of Correction ("DOC") for housing in a correctional facility for children. The only issue he raises is whether that order was an abuse of the juvenile court's discretion.

[2] We vacate the dispositional decree[1] and remand.

# Facts and Procedural History

[3] T.C. is a minor who was born on December 23, 2002. On October 22, 2018, T.C. was suspended from school, arrested, and alleged to be a delinquent for an act that would be theft as a Class A misdemeanor if committed by an adult.[2] The basis for that allegation was that he stole money that fellow students had obtained for a fundraiser. On January 29, 2019, T.C. was placed on Informal Adjustment. However, before completing the informal adjustment, T.C. was arrested again on June 9, 2019, for leaving home without permission. The informal adjustment was closed unsuccessfully, and, on June 10, the State filed formal allegations in cause number 09C01-1906-JD-34 ("JD-34") that T.C. was a delinquent child for committing Count I, theft as a Class A misdemeanor if committed by an adult, and Count II, leaving home without permission, a

---

[1] T.C. does not challenge the delinquency or probation violation adjudications, only the disposition.

[2] Ind. Code § 35-43-4-2(c).

status offense.[3]  At an initial hearing, T.C. admitted to Counts I and II.  On June 10, the juvenile court placed T.C. on formal probation and ordered him to pay restitution, engage in twenty hours of community service, participate in electronic monitoring through an ankle bracelet for thirty days, obtain an assessment at Four County Counseling Center ("FCCC"), participate in Moral Reconation Therapy ("MRT"), and pay court costs.

[4]  On July 9, 2019, the State filed a petition to modify the dispositional decree in JD-34 because T.C. had violated probation by refusing a urine screen.  On July 10, the State filed another petition to modify because T.C. violated probation by being in "unapproved locations" on six different days.  App. Vol. II at 62.  On July 15, the State filed a third petition to modify on the grounds that T.C. had tested positive for cannabinoids on July 3, 2019, in violation of probation.  On July 24, T.C. admitted to the three counts of violating probation, and the juvenile court modified the dispositional order by adding the requirement that T.C. remain on GPS monitoring for sixty days.

[5]  The State subsequently filed five more petitions to modify in JD-34 on the grounds that T.C. had violated the terms of probation by:  Count IV, testing positive for marijuana; Count V, testing positive for marijuana; Count VI, truancy; Count VII, testing positive for marijuana; and Count VIII, testing positive for marijuana.

---

[3]  I.C. § 31-37-2-2.

On September 17, 2019, T.C. was found vaping in the school restroom. Upon questioning by school officials, T.C. was verbally abusive and cursing loudly, and he was subsequently suspended from school. On September 24, the State filed a new delinquency action under cause number 09C01-1909-JD-72 ("JD-72") in which it alleged that T.C. was a delinquent child for committing an act that would be disorderly conduct, as a Class B misdemeanor,[4] if committed by an adult. T.C. denied the allegation on October 30, and the court set a fact-finding hearing for December 12, 2019.

On November 13, 2019, the State filed another new delinquency action under cause number 09C01-1911-JD-84 ("JD-84"), in which it alleged that T.C. was a delinquent child for committing acts which would be the following crimes if committed by an adult: Count I, unlawful possession of a legend drug, as a Level 6 felony;[5] Count II, possession of a controlled substance, as a Class A misdemeanor;[6] Count III, criminal mischief, as a Class B misdemeanor;[7] Count IV, unlawful use of a police radio, as a Class B misdemeanor;[8] and Count V, possession of marijuana, as a Class B misdemeanor.[9] At the November 13 initial hearing, T.C. denied all allegations in JD-84, the juvenile court set the

[4] I.C. § 35-45-1-3(a)(3).

[5] I.C. § 16-42-19-13.

[6] I.C. § 35-48-4-7(a).

[7] I.C. § 35-43-1-2(a).

[8] I.C. § 35-44.1-2-7(a)(1).

[9] I.C. § 35-48-4-11(a)(1).

matter for a fact-finding hearing on December 12, and the court ordered T.C. held at the Kinsey secure detention facility for children pending further order.

[8] On December 12, 2019, the juvenile court held fact-finding hearings in causes JD-34, JD-72, and JD-84. In JD-34, T.C. admitted to Violation Counts IV and V, both for testing positive for marijuana, and the court dismissed Violation Counts VI, VII, and VII. The trial court set the dispositional hearing on Violation Counts IV and V for January 15, 2020. Regarding JD-72, the juvenile court found that T.C. was delinquent for committing an act that would be disorderly conduct, as a Class B felony, if committed by an adult. The court ordered T.C. to remain in secure detention pending a January 15, 2020, dispositional hearing in that cause. In JD-84, the juvenile court found that the State had not met its burden to prove T.C. was delinquent as alleged in counts I through V.

[9] On January 13, 2020, the juvenile probation department filed a Predispositional Report. The report included a personal statement from T.C. to the juvenile court which stated as follows:

> I know the past year I haven't been a responsible citizen or a good role model to anyone. When I got sent to secure [detention] at first I wasn't going to change my ways, but now that I've really thought about my future[,] I have to change now because my lifestyle will get me nowhere in life. I would like to get my diploma and go to college or acquire a trade. I have been violating my probation so that's the first thing I am going to accomplish[,] along with finishing MRT and paying my dues off. I just want to become a better person for me and my family, I really miss them. I would like to get a 2nd chance to achieve my

goals and have a better year because I think 2020 will be a new chapter in my life and I can't wait to make good memories this year without getting into any trouble. Thank you for hearing me out, I appreciate it.

App. V. III at 62. The report also contained a statement from T.C.'s father which stated:

> [T.C.] seems like he has really learned his lesson since being in placed in secure detention. I don't feel like he needs to be locked up any longer for probation violations. If he continues in detention it will make things worse. [T.C.] is starting to think his life is over, and I don't want him to become more depressed. He is a kid and I don't want him to be traumatized by being locked up. [T.C.] has promised he will be better and I believe him. We are both willing to do whatever is necessary for him to come home. [T.C.] says he is wasting his life and days in detention and doesn't like it. He wants to come home, continue with his life, and make it better.

*Id*. at 63.

[10]    The Predispositional Report stated that T.C. is in the moderate risk category to reoffend. The report stated that T.C. has "done very well in secure detention," and is "respectful," "appropriate," and behaving "very well." *Id*. at 75. The report noted that T.C.:

> has had very little community[-]based services since being involved in the juvenile justice system. He has participated regularly in MRT since June 2019. [T.C.] and his father are willing to engage in additional services including individual counseling, MRT, and home-based services should he be released from secure detention on 1/15/2020. It appears as if the two of

them could benefit from services in order to help mend their relationship, which could be contributing to the delinquency and non-compliance. T.C. reports he lived on and off with his grandparents while growing up. [T.C.'s father] seems very "hands off" and is often working and does not make it a priority to spend time with his son. However, since [T.C. has been] in detention, [T.C.'s father] has been consistent in visiting his son and has stayed in contact with him via telephone.

*Id*. The juvenile probation department recommended that the juvenile court order community-based services for T.C. as those "services have not been exhausted." *Id*. The report further stated that:

MRT has been the only consistent service so far that the juvenile has participated in. [T.C.'s father] has previously been somewhat resistant to services. Additionally, probation did not push services during a period of compliance with probation. Community[-]based services such as intensive home-based case management, individual/family therapy, and the completion of MRT should be provided to the juvenile and his family at this time as the purpose of the juvenile justice system is rehabilitation. Both [T.C.] and his father are currently in agreement to participate in all community[-]based services that are deemed appropriate.

*Id*. The juvenile probation department stated that it did not recommend placement in the DOC

at this time due to [T.C.'s] limited legal history and level of offenses. The juvenile does not have any felony adjudications. If placed at DOC, the juvenile will be in a punitive setting and be around some of the most hardened juveniles in the state of Indiana. Placing him in IDOC at this time is contrary to the goal of the juvenile justice system, which is rehabilitation.

*Id*.

On January 13, the Kinsey Youth Detention Center also submitted to the court a report regarding T.C. The report noted that, during the approximate two months T.C. had been at the detention center, T.C. was "respectful" except for one incident when he called a staff person a name. The report noted that T.C. was "appropriate," "participat[ing]," and doing "extremely well" with "positive behaviors and attitudes" until the prior week when he engaged in the name-calling. *Id*. at 78. The report stated that T.C. was "respectful" and "cooperative." *Id*. at 79.

On January 15, 2020, the juvenile court held a dispositional hearing in causes JD-34 and JD-72 and issued a dispositional order in which it awarded wardship of T.C. to the DOC "for housing in any correctional facility for children."[10] Appealed Order at 6. In reaching that decision, the juvenile court rejected the probation department's recommendations for T.C. on the grounds that they were "not steps forward, they are steps *backward*, into services that have previously failed." *Id*. at 5 (emphasis in original). The court found the probation department's recommendation failed to consider the "safety of the community," by "communicating to other juveniles that they can expect a similar lack of sanction for similar behavior." *Id*. The juvenile court further

---

[10] The court also ordered the DOC to provide it with at least ten days' notice prior to release of T.C. from the DOC "for the purpose of setting a hearing as to the issue of continued supervision." Appealed Order at 6.

found that T.C., "by his behavior and demeanor, has at no point expressed anything but contempt for the law, probation, and the Court." *Id.* The trial court stated that it took "extreme umbrage at the suggestion from the Cass County Juvenile Probation Department that this should be treated as an episode of *Kids Say the Darndest Things*." *Id.* The court concluded that T.C. is a "threat to the safety and well-being of [the] students" of the local school system and the community, and that there was "no reason to engage in a process for which the juvenile has expressed nothing but disdain." *Id.* at 5-6.

[13] The juvenile court concluded that it was in T.C.'s best interest and the safety interests of the community that T.C. remain removed from his home because of the delinquency adjudications, the probation violations, "the rate at which the juvenile's behavior has deteriorated," the parent's "inability or refusal to care for or control the juvenile," and the "juvenile's repeated disregard and contempt for all authority." *Id.* at 6.

[14] T.C. now appeals.

# Discussion and Decision

[15] T.C. has a total of three delinquency adjudications: two for conduct that would be a Class A misdemeanor and a Class B misdemeanor, respectively, if committed by an adult, and one for a status offense. He also has a total of five probation violations in JD-34: four for testing positive for marijuana and one for truancy. However, T.C. does not challenge his delinquency or probation

violation adjudications; rather, he challenges the juvenile court order awarding wardship of him to the DOC.

[16] The specific disposition of a delinquent child is within the juvenile court's discretion, to be guided by the following statutory considerations:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>> (A) in the least restrictive (most family like) and most appropriate setting available; and
>>
>> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

I.C. § 31-37-18-6; *see also*, *K.S. v. State*, 849 N.E.2d 538, 544 (Ind 2006). We reverse only for an abuse of discretion—that is, a decision that is "clearly against the logic and effect of the facts and circumstances before the court, or

the reasonable, probable, and actual deductions to be drawn therefrom." *K.S. v. State*, 114 N.E.3d 849, 854 (Ind. Ct. App. 2018), *trans. denied*. When a juvenile court approves or rejects the recommendations of a predispositional report, it must state its reasoning. I.C. § 31-37-18-9.

[17] Here, it is clear that the court did not place T.C. in the "least restrictive alternative" that interfered least "with family autonomy," is "least disruptive of family life," and "imposes the least restraint on the freedom of the child" and his parent. I.C. § 31-37-18-6(1)-(4). However, placement in a more restrictive environment is permissible when it is in the child's best interests and/or promotes the safety of the community. *Id.*; *see also, e.g.*, *M.C. v. State*, 134 N.E.3d 453, 459 (Ind. Ct. App. 2019), *trans. denied*. Thus, we must affirm the juvenile court's decision to place T.C. with DOC rather than ordering the less restrictive community-based services the probation department recommended unless that decision is "clearly against the logic and effects of the facts and circumstances before the court." *K.S.*, 114 N.E.3d at 854. We hold that it is.

[18] The juvenile court stated that the probation department's recommendations were "not steps forward, they are steps *backward*, into services that have previously failed." Appealed Order at 5. However, the evidence established that the probation department recommended community-based services specifically because most of them had *not* been tried previously. Rather, T.C. had only been given MRT services. He had not been given any other community-based services such as "intensive home-based management and individual/family therapy," which the probation department recommended as

the least restrictive placement. App. V. III at 75. Thus, the trial court erred in finding that the recommended services had already been provided but failed.[11]

[19]     The juvenile court also found that the recommended community-based services did not take into consideration the safety of the community. The "safety" issue the juvenile court identified was the "public policy disaster" that it found would ensue "by communicating to other juveniles that they can expect a similar lack of sanction for similar behavior." *Id*. That finding is clearly against the facts and circumstances before the court in that it fails to take into consideration that T.C. had already been placed in secured detention for two months at the time of the dispositional hearing. Moreover, that finding also misapplies the law. First, the placement of a delinquent child must be based not on considerations of other hypothetical juveniles, but on the circumstances of the individual child before the court. *See E.L. v. State*,783 N.E.2d 360, 367 (Ind. Ct. App. 2003) (noting the juvenile court must make its dispositional determination based on the individual juvenile rather than policy considerations). Second—and most importantly—the disposition in a delinquency action must be based on principles of rehabilitation, not the desire to punish or "sanction" the juvenile. *Id*. at 366.

---

[11] The State contends that this case is similar to *M.C. v. State*, 134 N.E.3d 453 (Ind. Ct. App. 2019), *trans. denied*, and other cases where we upheld dispositional orders awarding wardship of juveniles to the DOC. However, unlike in this case, in *M.C.* "the evidence establishe[d] that many less restrictive rehabilitative efforts have failed to reach M.C. and have not produced positive changes in his behavior…" *Id*. at 459; *see also, e.g.*, *S.C. v. State*, 779 N.E.2d 937, 938 (Ind. Ct. App. 2002) (noting the juvenile had been provided, among other things, inpatient and outpatient counseling), *trans. denied*.

[20] In reaching its decision, the juvenile court further found that T.C. "at no point expressed anything but contempt for the law, probation, and the Court," and that T.C. had an "inability or refusal to participate in his own rehabilitation" that "further makes him a threat to the safety of the community." Appealed Order at 5, 6. Those findings are also clearly against the logic and effect of the facts and circumstances before the court. T.C.'s statement to the court showed contrition and a respectful request for the court to place him in home-based services. In addition, the reports of both the Kinsey detention facility and the juvenile probation department provided evidence that, in the two months prior to the hearing, T.C. had been respectful, cooperative in his rehabilitation services, and well-behaved, with the minor exception of one incident of name-calling. There was no evidence before the juvenile court that T.C. had been contemptuous and disrespectful of the law, probation, or the court in recent months; rather, the evidence showed that he was actively participating in his rehabilitation during that time.

[21] The juvenile court's finding that the probation department did not take T.C.'s behaviors seriously—treating it "as an episode of *Kids Say the Darndest Things*"—was also clearly against the facts before the court. Appealed Order at 5. The probation department did a lengthy, detailed predispositional report in which it reviewed T.C.'s juvenile delinquency history, family situation, mental health, and education. It also appropriately reviewed and took into consideration T.C.'s conduct and response to services and secure detention in recent months. Thus, the insinuation that the probation department did not

take T.C.'s actions seriously was clearly against the logic and effect of the facts and circumstances before the court.

[22] In sum, the juvenile court's findings that it is in the best interests of T.C. and the safety of the community that T.C. be made a ward of the DOC are clearly against the logic and effect of the facts and circumstances that were before the court. Rather, those facts and circumstances established that it would be consistent with the safety of the community and T.C.'s best interest if he was offered the less restrictive alternative of community-based services such as intensive home-based case management and individual/family therapy, as recommended by the juvenile probation department. Such a disposition is the least restrictive setting, interferes least with family autonomy, is least disruptive of family life, imposes the least restraint on T.C. and his father, and provides a reasonable opportunity for T.C.'s father to participate in T.C.'s rehabilitation. *See* I.C. § 31-37-18-6(1)-(5).

[23] We vacate the dispositional order and remand for proceedings consistent with this decision.

Crone, J., and Altice, J., concur.